UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

        Plaintiff,

                              Case No. 21-20141

v.

                              Hon. Judith E. Levy

Danny Jo Thompson II,

        Defendant.

_____/

**Government's Sentencing Memorandum**

### I. Introduction

Danny Jo Thompson helped acquire, build, and test-fire a machinegun for his friend, Eric Allport. Allport had the machinegun in his vehicle during a nearby shootout with FBI agents: he shot one agent and was killed by return fire. Allport was only feet from his fully automatic machinegun and hundreds of rounds of ammunition when he died. To make matters worse, Thompson armed Allport with the machinegun *knowing* that Allport was a felon and that Allport harbored extremely violent, anti-law enforcement views—views that Allport regularly shared with Thompson. Given the seriousness of Thompson's

conduct, the government recommends a 33-month sentence, the top of the guidelines.

## II. Background

### a. FBI Investigation into Boogaloo members Eric Allport and Danny Jo Thompson

In May 2020, the FBI opened a domestic terrorism investigation into several Boogaloo members[1] in Kansas and Oklahoma, which led them to Allport and Thompson. A review of Thompson and Allport's Facebook accounts showed that both men were committed Boogalooers who combined their love of firearms with their hatred of law enforcement, playing off each other and pushing one another towards violence. Towards shooting a law enforcement officer. Here is just a small sample of Thompson and Allport's communications in the 14 months before Allport's shootout:

- Allport to Thompson: "I just rode home with the AR in my lap. Like fuck it. If I get pulled over, theres only one way its gonna go down. Might well drive at peak freedom and light up em up out the gate of I get pulled over."

---

[1] Boogaloo adherents coalesced online in 2019 as a decentralized, primarily anti-government, anti-authority, anti-law enforcement movement, and believe that it is their duty to act on their beliefs, actively endorsing and carrying out anti-government violence to provoke conflict.

- Allport to Thompson: "The ultimate swat welcome accessory. 10 shots from [220 grain hard cast—powerfully penetrating bullets] into the entry team amd they'll be an exit team. idgaf [I don't give a fuck] what gear and weapons they brought, they'll be hunkering down and calling daddy."

- Allport sent Thompson a picture of his weapons stashed in his truck, and Thompson responded: "Hahaha you willing to die today? Because I sure as fuck am lol."

- Allport sent the following picture to Thompson:



- Thompson: "Just with how fucked everything is and I like legit don't see myself beinig alive in like ten years with the 'boog' shit."

- Thompson sent the following picture:



3

- Allport to Thompson about what will happen if police officers ever pull him over: "Despite me being very specific about what will happen if I'm ever in a car that gets pulled over. […] But I don't think theyre capable of believing, or at least actually applying their belief to reality in regards to me being capable of doing what what I say I'll do."

- Allport sent a picture of himself and his parents at Ruby Ridge and told Thompson: "Fucks these cucks. AMD fuck any motherfucker who thinks they know who the fuck I and thinks this shit is extreme. Bitch, I havent even gotten warmed up. […] I went from there to straight up domestic terrorism."

    - Thompson replied: "People don't realize the attack began a long time ago. They don't realize they are the enemy. It's all fun and games to talk about the boogaloo and shit but this shit is real as fuck and not a joke. The lines already been drawn."

- Thompson sent the following picture to Allport less than five months before Allport shot an FBI agent:



In addition to their violent, anti-law enforcement, pro-Boogaloo communications, evidence from their Facebook accounts showed that (1) Thompson—knowing that Allport was a felon—straw purchased assault

4

rifle parts for him; (2) Thompson and Allport, working together, each built a fully-automatic machinegun; and (3) that they both tested their weapons to confirm that they operated in full-auto mode. PSR ¶¶ 9–10.

Thompson purchased the two lower receivers necessary to convert his and Allport's AR-style rifles into fully automatic machineguns in September 2019, lying on the federal firearms forms and stating that both were for him when he knew one was for Allport—a felon. In fact, the same day that Thompson purchased the lower receivers, Allport asked: "so you're cool with buying one for me? I don't want to push you man." And Thompson replied: "yeah I don't mind! The way I see number 1 I believe in it and trust you. 2 you could buy this from anyone very easily. Ya know what I mean? […] It's just a process I gotta go through" PSR ¶ 12.

Thompson and Allport spent October 2019 converting their AR-15s into fully automatic machineguns: they discussed and purchased the necessary parts and components and regularly sent pictures and videos back and forth showing their progress. On October 27, Thompson and Allport traveled to a friend's property and fired at least one of the machineguns in full-auto mode. PSR ¶ 14. A video showed Allport firing

5

the machinegun. A later video showed Thompson and his friends firing Thompson's machinegun in full-auto mode. PSR ¶ 16. Thompson had successfully built his own machinegun and helped Allport—a felon—to build one as well.

### b. Allport shoots an FBI agent attempting to arrest him leaving the Post Office

On October 2, 2020, FBI agents tried to arrest Allport when he walked out of the Post Office. Unfortunately, Allport was armed.

When agents approached him, Allport pulled out a gun and started shooting as he ran from the agents. Allport shot one agent in the thigh: agents returned fire killing Allport. PSR ¶ 18. Allport was shot in the parking lot near his truck. Inside agents found the fully automatic machinegun that Thompson procured for him, a shotgun, another pistol, and hundreds and hundreds of rounds of ammunition for the weapons. Some of the ammunition was in extended, high-capacity magazines. Other rounds—including ammunition for his machinegun—were in double stacked magazines: magazines taped together to allow for faster changing of an empty magazine. Double stacked magazines allow someone with a machinegun to fire even more rounds in an even shorter period.

Agents planned to search Thompson's residence for his machinegun after arresting Allport, but the shootout delayed the search. Thompson learned about Allport's death during the delay. Consequently, agents did not find his machinegun when they executed a search warrant at Thompson's house several hours after the shootout. They did find ten other firearms, ammunition, and some illegal drugs. After he was charged in this case, Thompson's attorney gave the government the lower receiver that Thompson modified to fire as a machinegun. The lower received had been altered and obliterated (disfigured, scratched, and pieces of metal cut off) in an attempt to distort it. PSR ¶ 19.

The government indicted Thompson for making false statements when purchasing a firearm, possessing an illegal machinegun, and aiding and abetting Allport's possession of an illegal machinegun. PSR ¶ 1. Thompson pleaded guilty to count two, possessing a machinegun, and count three, aiding and abetting Allport's possessing of a machinegun, and stipulated for sentencing purposes that he acted as a straw-purchaser for Allport. PSR ¶ 4; ECF No. 15.

### III. Guidelines Calculation

The PSR finds and the government agrees that Thompson's guideline range is 27–33 months, based on a total offense level of 17 and a criminal history category of II. PSR ¶ 66. While the guidelines are advisory, the Court must begin sentencing analysis by calculating the correct range. *See United States v. Booker*, 543 U.S. 220, 245 (2005).

### IV. Sentencing Factors

Congress has provided factors for courts to consider when imposing a sentence in 18 U.S.C. § 3553(a). The most relevant factors for this defendant are addressed below.

  a. <u>Nature and Circumstances of the Offense, 18 U.S.C. § 3553(a)(1)</u>

Danny Thompson built himself an illegal machinegun, acted as a straw-purchaser, and bought the parts necessary for his friend Eric Allport—whom Thompson knew to be a felon—to build and possess a second illegal machinegun. Those are serious offenses justifying a significant sentence. America has a major problem with gun violence: *every day* 124 Americans are killed by guns[2] and 316 are shot and

---

[2] https://www.pewresearch.org/fact-tank/2022/02/03/what-the-data-says-about-gun-deaths-in-the-u-s/

8

wounded.[3] Every day. Converting already deadly assault rifles into fully automatic machineguns—weapons whose only purpose is to kill faster and wound more indiscriminately—threatens the safety of our community. And knowingly providing a machinegun to a felon is worse.

The dangers posed by actions like Thompson's—possessing an illegal weapon or acting as a straw-purchaser—are often considered in the abstract: what could have happened or what might have been. There is an element of the hypothetical in this case as well: imagine what would have happened if Allport made it to his truck, where his fully automatic machinegun and hundreds of rounds of ammunition were waiting? How many people could he have shot then? How many agents *would* he have shot? How many innocent bystanders? All because Thompson gave him a machinegun.

But unfortunately, this case isn't just about the hypothetical. Eric Allport *did* open fire on law enforcement. Eric Allport *did* shoot an FBI agent. And, consequently, officers returned fire and killed him. An agent ended up with a bullet in his thigh, Allport ended up dead, and Allport's child—born days after the shooting—will never know their

---

[3] https://www.bradyunited.org/key-statistics

father. And while Allport did not use the gun Thompson provided him to shoot at law enforcement, he tried to. And if he'd had, the situation would have been that much worse: fully automatic, machinegun worse.

But this case is about a lot more than just machineguns. Because Thompson *knew* what Allport wanted to do with the machinegun Thompson gave him. He knew what Allport *would* have done with it if he'd had just a few more seconds. Thompson and Allport regularly talked about why they wanted an arsenal. Not to hunt. Not to protect themselves. Not for the necessity of a well regulated Militia. They wanted these machineguns to shoot and kill law enforcement officers.

Thompson and Allport said over and over and over again that they wanted to shoot a police officer—and not for any specific reason: just because they were officers. Allport got his wish. He shot an FBI agent and died in the return fire. Allport's machinegun was there too, feet from his dead body. And Thompson helped him do it by buying the parts for Allport's machinegun, helping him build it, and test-firing it, *all the while knowing* that Allport was a felon with violent, anti-law enforcement beliefs. While Thompson didn't pull the trigger, he was a significant contributing factor.

The fact that Thompson's guideline range is relatively low should not diminish the seriousness of his conduct. A 33-month, top of the guideline sentence is appropriate in this case given Thompson's extreme conduct.

    b.  <u>History and Characteristics of the Defendant, 18 U.S.C. § 3553(a)(1)</u>

The government acknowledges that Thompson has a negligible criminal history. But he also has a history of violent, anti-law enforcement rhetoric that foreshadowed Allport's shooting an FBI agent. He spoke openly about his desire to kill law enforcement and his belief in the Boogaloo. In short, Thompson *said this was going to happen*. He called Allport's shot. Who Danny Thompson is—his history and characteristics—goes beyond his criminal record.

A similar case out of the Eastern District of New York, *United States v. Miner*, is instructive. The defendant in that case pleaded guilty to possessing a defaced firearm and was in criminal history category one. But like Thompson, he shared the Boogaloo ideology and "posted about acquiring weapons for 'boogaloo purposes.'" *United States v. Miner,* No. 20-CR-00554 (WFK), 2021 WL 2953178, at *2 (E.D.N.Y. July 13, 2021). The court sentenced Miner to 57 months imprisonment, the

11

top of the guideline range. *Id.* at *4–5. While Thompson's conduct goes well beyond Miner's—he built two machineguns and the crime ended with an officer shot and Allport dead—their history and characteristics are similar. A top of the guideline sentence is also appropriate here given Thompson's violent, anti-law enforcement statements. Statements that encouraged Allport to shoot an FBI agent, like this image that Thompson sent Allport:



   c.  Seriousness of the Offense, Just Punishment, and Respect for Law, 18 U.S.C § 3553(a)(2)(A)

The guidelines create a sentencing range so that courts can sentence similarly situated defendants appropriately based upon the severity of their conduct—just punishment. Here, 33 months—the top of the guidelines—is just. There are few cases comparable to Thompson's, but sentences are very rarely light. *Miner*, discussed above, is the

closest comparator the government found: and he was sentenced to 57 months, the top of his guideline range. Timothy John Watson, a Boogalooer, sold devices that could turn AR-15 rifles into machineguns to other Boogalooers. The court sentenced him to 60 months because he sold multiple devices. *See* Judgment, *U.S. v. Timothy John Watson*, ECF No. 70, 20-cr-00042, Northern District of West Virginia. While *Watson* involved more machineguns parts than were at issue here, *Watson* did not involve a participant shooting an FBI agent.

The guideline range is "the starting point and initial benchmark but are not the only consideration." *Gall v. United States*, 552 U.S. 38, 39 (2007). Thompson's guideline range includes his meager criminal history and the fact that he possessed a machinegun and aided and abetted the possession of a second machinegun by a felon. If these were the only considerations, a sentence at or even below the bottom of the range might be appropriate. But this isn't that case. Thompson's support for the Boogaloo movement, his violent, anti-law enforcement statements, the fact that he provided a machinegun to a felon *knowing* that the felon wanted to shoot law enforcement officers, and the fact

13

that Allport *did* shoot an FBI agent compel a sentence at the top of the guideline range. That is the just sentence.

    d. <u>Adequate Deterrence and Protecting the Public, 18 U.S.C. § 3553(a)(2)(B) and (C)</u>

It is hard to know what could possibly deter someone with beliefs as violent, as anti-law enforcement as Thompson's, especially when this Court is part of the system that Thompson so passionately hates. A significant, 33-month prison sentence for someone who has spent only a few days in jail *might*. Allport's death *might*.

Conversely, given Thompson's hatred of law enforcement, and given that Allport shot an FBI agent, a lenient sentence here may only reinforce Thompson's belief that shooting law enforcement officers isn't really that big of a deal. That his actions—his crimes—weren't that serious. Not so. A top of the guidelines sentence is necessary for both specific and general deterrence. Thompson needs to know that providing illegal firearms to others who intend to commit violence against law enforcement will be met with significant punishment. And other similarly situated individuals—those who are contemplating committing violent acts against law enforcement themselves or arming

14

other people who harbor such intentions—will likewise be punished. Severely.

Finally, even if Thompson cannot be deterred, our community deserves to be protected from him, at least for 33 months. A top of the guidelines sentence is warranted here.

## V.     Conclusion

The United States recommends that the Court impose a 33-month sentence, the top of the guideline range, followed by three years of supervised release.

Respectfully submitted,

Dawn N. Ison
United States Attorney

*s/ Hank Moon*
Hank Moon
Assistant United States Attorney
(313) 226-0220
Hank.Moon@usdoj.gov

Date:  March 9, 2022

# **CERTIFICATE OF SERVICE**

I hereby certify that I sent a true and accurate copy of the Government's Sentencing Memorandum to defense counsel by electronic filing.

*s/ Hank Moon*
Hank Moon
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-0220
Hank.moon@usdoj.gov
